******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* MAURICE FRANCIS
(AC 35753)

Gruendel, Lavine and Alvord, Js.

*Argued December 3, 2013—officially released March 18, 2014*

(Appeal from Superior Court, judicial district of Hartford, Gold, J. [competency determination]; Dewey, J. [motions to suppress, for competency evaluation; judgment].)

*John L. Cordani, Jr.*, assigned counsel, for the appellant (defendant).

*Kathryn W. Bare*, assistant state's attorney, with whom, on the brief, were *Gail P. Hardy*, state's attorney, and *Donna Mambrino* and *Richard J. Rubino*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Maurice Francis, appeals from the trial court's judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a. On appeal, the defendant claims that the court improperly (1) denied his motion to suppress statements that he had given police officers in the absence of *Miranda*[1] warnings; (2) (a) determined in a pretrial ruling that he was competent to stand trial, and (b) denied his defense counsel's requests for an additional competency evaluation made during the trial proceedings; (3) forced him to choose between his right to representation by counsel and his right to testify on his own behalf; (4) dismissed a juror during the trial; and (5) charged the jury in supplemental instructions on intent. We disagree and affirm the judgment of the trial court.

The jury reasonably could have found the following facts. In November, 2008, the defendant and his girlfriend, Tashima Reddick, lived together in Reddick's apartment at 47 Berkeley Drive in Hartford. They began dating ten or eleven months earlier, and the defendant immediately moved in with Reddick. During the course of their relationship, Reddick's demeanor changed from being happy and outgoing to being unhappy and withdrawn. She avoided the family gatherings that she had attended in the past. At work, her supervisor noticed bruising and other unexplained injuries on her body.

On November 1, 2008, sometime between 8:30 a.m. and 8:45 a.m., Beverly Copeland, who lived diagonally across the street from Reddick's apartment, got into her car and was preparing to leave when she noticed unusual activity on the front lawn at 47 Berkeley Drive. A black male was standing in the grassy area and picked up what Copeland originally thought to be a pile of clothing. Copeland quickly determined that the male had picked up a body and was carrying a female over his shoulder. After he had taken a few steps, he dropped the body to the ground and began dragging her through the grass and across the street to a silver Volvo station wagon. The male placed the female in the front passenger seat of the vehicle and then drove past Copeland's vehicle. Copeland could not see the male's face as he drove alongside her vehicle because he was looking at his passenger and was facing away from Copeland. Copeland did, however, write down the license plate number of the Volvo. According to the records of the Department of Motor Vehicles, the defendant was the owner of that 1998 Volvo station wagon.

The defendant had purchased the 1998 Volvo in October, 2008, from Garth Wallen at Sparks Motor Sales, LLC, in Hartford. Between 8:30 a.m. and 9 a.m. on November 1, 2008, the defendant called Wallen, who was then at home, and they agreed to meet at the dealer-

ship at 9:30 a.m. The defendant complained that he had been having problems with the Volvo, and Wallen offered the option of returning the 1998 Volvo in exchange for another vehicle. When Wallen arrived at the dealership, the defendant already was waiting for him by the locked gate. The defendant was standing outside of his vehicle, and Wallen noticed a female in the front passenger seat. Wallen could see that her seat belt was fastened.

After Wallen unlocked the gate, the defendant drove his vehicle into the lot and parked to the side of the building. At some point during the day, Wallen secured a 1999 Volvo station wagon for the defendant. The defendant transferred his license plate from the 1998 Volvo to the 1999 Volvo. Wallen noticed, as the defendant was making the plate transfer, that the defendant had positioned the two Volvos passenger side to passenger side. Wallen did not notice how or when the female passenger left the 1998 Volvo. Although the defendant had been at the dealership from early morning until nearly 4 p.m., Wallen never spoke with the female passenger, nor did he see her leave the 1998 Volvo at any point in time during the day. After the defendant left the dealership, he then called Wallen at 4:44 p.m. to report that he liked the 1999 Volvo much better than the 1998 Volvo. No further calls were made from the defendant's cell phone to Wallen on that day.

Later that evening, two firefighters from the Hartford Fire Department responded to a 911 call placed by the defendant at 10:51 p.m. They were dispatched to Reddick's apartment. When they arrived at 10:57 p.m., the defendant was standing outside the building, and he directed them to the second floor. Reddick was in the bathtub; she was naked and the bathtub contained no water. Although there appeared to be numerous wounds on her body, there was no blood in the bathroom or in the bathtub, and the firefighters did not wipe any blood off her body. After they removed Reddick from the bathtub, one of the firefighters performed cardiopulmonary resuscitation until the emergency medical technicians arrived. Reddick was pronounced dead at 11:20 p.m.

Detectives Richard Salkeld and Seth Condon, with the Hartford Police Department, also were dispatched to the scene and arrived at approximately 11:30 p.m. They saw the defendant outside Reddick's apartment and wanted to question him about the circumstances surrounding his discovery of Reddick's body. Before they asked any questions, however, the defendant complained that he was having chest pains and that he needed to go to a hospital. Shortly thereafter, the defendant was taken by ambulance to a hospital. He was discharged early in the morning of November 2, 2008, and was transported by a police cruiser to the police station. When the defendant arrived at the station, he

agreed to speak with Salkeld and Condon about the events of the previous day. At that point in time, the police did not know the cause or manner of Reddick's death. The detectives did not provide the defendant with *Miranda* warnings because he was not under arrest.

During his interview at the police station, the defendant gave the detectives the following account of his activities on November 1, 2008. At approximately 8 a.m., he and Reddick left her apartment, and he drove them to Sparks Motor Sales, LLC, in the 1998 Volvo. The defendant performed "odd jobs" at the dealership during the day while Reddick sat in the car. Reddick never left the vehicle while they were at the dealership, although the defendant did bring her five bottles of water during the course of the day. When they left the dealership at approximately 5 p.m., Reddick switched from the front passenger seat of the 1998 Volvo to the front passenger seat of the 1999 Volvo. They arrived at Reddick's apartment about fifteen minutes later. Reddick stayed at the apartment, and the defendant left at 5:20 p.m. to return to the dealership to "clean up." He was supposed to meet with Wallen later that evening at Wallen's home in East Hartford, so he left the dealership at 6:20 p.m. for that purpose. Although the defendant could not remember the street name or house number of Wallen's address, he waited in East Hartford for Wallen until 10:30 p.m. Wallen never showed up. The defendant called Wallen's cell phone number several times that evening in an attempt to reach him, but was unsuccessful. He left East Hartford at 10:30 p.m. and returned to Reddick's apartment. When he arrived, the door to the apartment was open and all of the lights were on. He entered the apartment, found Reddick in the bathtub and called 911.

Susan Williams, an associate medical examiner, performed the autopsy on Reddick's body on November 3, 2008. In her report, Williams preliminarily noted that Reddick, who was twenty-nine years old, had black curly hair with braided, long black extensions. According to Williams, the body had multiple injuries on the head, shoulders, arms, legs and back, approximately seventy-five in total, which consisted of several fresh incised wounds, several healing incised wounds, abrasions, contusions, hemorrhages and scars. The fresh incised wounds were caused by a sharp instrument, probably a knife or scissors. The injuries were not considered to be stab wounds, because they were wide on the skin rather than deep into the skin. None of the wounds penetrated an internal organ or major artery. No single wound caused her death.[2] The number of injuries resulted in major blood loss, and she "bled out." The cause of death was determined to be multiple sharp force injuries, and the manner of death was determined to be homicide. Williams was unable to determine an exact time of death.

During the course of the investigation, Hartford police officials interviewed witnesses and collected evidence from the crime scene. Ramone Baez, an investigator with the department, collected braid extensions from the lawn in front of Reddick's apartment and swabbed bloodstains on the doors and door frames in the apartment. Detective Claudette Kosinski processed the defendant's 1998 and 1999 Volvo station wagons. She collected a Poland Springs water bottle under the front passenger seat of the 1998 Volvo and took photographs of grass, leaf and dirt debris on the floor of the front passenger's side of the 1998 vehicle. Additionally, Kosinski retrieved a hair strand and swabbed a blood-like stain from the same areas in the 1998 Volvo.[3] Detective William J. Siemionko reviewed telephone records for the cell phone numbers of Wallen and the defendant. He determined that, contrary to the defendant's account, the defendant did not place any calls to Wallen after 4:44 p.m. on November 1, 2008, and that the defendant had not called Reddick's cell phone number the entire day.

Following the criminal investigation, the defendant was arrested on June 26, 2009. Prior to trial, defense counsel made oral and written motions for competency evaluations pursuant to General Statutes § 54-56d.[4] Initially, the court found the defendant incompetent to stand trial but restorable to competency. On May 16, 2011, the court, *Gold, J.*, found the defendant competent to stand trial and assist in his own defense. On September 28, 2011, defense counsel orally requested an additional pretrial competency examination. The court, *Alexander, J.*, granted the motion, and a hearing was held on January 6, 2012. Judge Alexander found that the defendant was competent to stand trial. Approximately two weeks later, jury selection began, and the defendant's trial commenced on February 6, 2012.

On February 10, 2012, after the state rested, defense counsel orally requested another competency evaluation, which was denied by the court, *Dewey, J.* That same day, one of the jurors handed a note to the court clerk with a question regarding certain evidence that had been presented during the trial. After the court questioned the juror in the absence of the remaining jurors, the court excused that juror and he was replaced with an alternate juror. Immediately thereafter, the defendant testified on his own behalf. The parties rested and counsel made their closing arguments.

The next court day, February 14, 2012, the court charged the jury. The court provided a copy of its written instructions to the jury as a court exhibit. After the jury requested and received a playback of certain portions of a witness' testimony, the court received another note from the jury late that afternoon requesting clarification of the court's instruction on intent. After discussing the note with counsel, the court

told the jurors that it would provide a clarification on intent the next morning.

On February 15, 2012, the court presented counsel with its proposed supplemental instruction on intent. After further discussion on the record, the court called the jury into the courtroom and gave its supplemental instruction. Shortly thereafter, the court received another note from the jury that presented a hypothetical situation and asked if "intent to commit murder" could be found under those circumstances. The court discussed the note with counsel and offered its proposed response to the jury. Defense counsel stated that he would like a more specific and comprehensive supplemental instruction on intent. The court determined that a less expansive supplemental instruction would be sufficient. That same day, after the court had given the additional supplemental instruction on intent, the jury returned its verdict finding the defendant guilty of the crime of murder. This appeal followed.

## I

The defendant's first claim is that the court improperly denied his motion to suppress the statements that he had given Salkeld and Condon, in the absence of *Miranda* warnings during the interview, on November 2, 2008. The defendant argues that he was taken into custody when a search warrant was executed on him while he was being interviewed at the police station. The search warrant required him to give a buccal DNA sample and to surrender his clothing for testing. The defendant's position is that the execution of the search warrant converted the interview into a custodial interrogation. Although he did not confess to the crime, he claims that the state presented evidence at trial to show that his statements were untrue, thereby demonstrating a "consciousness of guilt."

At the time the court heard testimony on the defendant's motion to suppress, the trial already had commenced and the state intended to present the defendant's statements through its next witness. Accordingly, the court, after hearing the testimonial evidence outside of the presence of the jury, found that the defendant was not in custody at the time he made the statements to Salkeld and Condon, and denied the motion to suppress. The court's reasoning with respect to its conclusion that the defendant was not in custody was provided later in the court's memorandum of decision issued on September 7, 2012.

In its memorandum of decision, the court made the following factual findings: (1) at the time of the interview, the detectives had not yet determined a cause of death for Reddick; (2) Salkeld advised the defendant that he was free to leave the police station; (3) the defendant was not threatened or restrained, and the detectives did not make any offers or promises in return

for his statements; (4) the defendant appeared to understand the proceedings, and there was no reason to believe that he did not understand the proceedings; (5) the defendant provided the detectives with his name, address, social security number, information with respect to his car, and cell phone information for his and Reddick's phones; (6) the defendant never asked to leave the police station during the interview, nor did he request that the detectives stop questioning him; (7) the defendant did not complain of any physical ailments during the interview; and (8) the defendant was allowed to leave the police station and was not arrested until more than seven months after he had given his statements. The court made no factual findings, or any other determinations, with respect to the execution of the search warrant on the defendant while he was at the police station.

"Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. . . . [A]lthough the circumstances of each case must certainly influence a determination of whether a suspect is in custody for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. . . . Further, the United States Supreme Court has adopted an objective, reasonable person test for determining whether a defendant is in custody. . . . Thus, in determining whether *Miranda* rights are required, the only relevant inquiry is whether a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest. . . .

"Furthermore, we note that [n]o definitive list of factors governs a determination of whether a reasonable person in the defendant's position would have believed that he or she was in custody. Because, however, the *Miranda* court expressed concern with protecting defendants against interrogations that take place in a police-dominated atmosphere containing inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely . . . circumstances relating to those kinds of concerns are highly relevant on the custody issue." (Internal quotation marks omitted.) *State* v. *Jackson*, 304 Conn. 383, 416–17, 40 A.3d 290 (2012). In determining whether a reasonable person in the defendant's position would have believed that his freedom of movement was restrained to the degree associated with a formal arrest, "our courts often have utilized the 'free to leave' test, pursuant to which *Miranda* warnings are required only if, under the circumstances, a reasonable person would believe that he or she was not free to leave the scene

of the interrogation." *State* v. *Hasfal,* 106 Conn. App. 199, 206, 941 A.2d 387 (2008). "The 'free to leave' test is a good fit for a *Miranda* inquiry when the police interrogate someone at a police station . . . ." (Citations omitted.) Id., 206–207.

"The defendant bears the burden of proving custodial interrogation. . . . The trial court's determination of the historical circumstances surrounding the defendant's interrogation are findings of fact . . . which will not be overturned unless they are clearly erroneous. . . . In order to determine the [factual] issue of custody, however, we will conduct a scrupulous examination of the record . . . in order to ascertain whether, in light of the totality of circumstances, the trial court's finding is supported by substantial evidence. . . . The ultimate inquiry as to whether, in light of these factual circumstances, a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest . . . calls for application of the controlling legal standard to the historical facts [and] . . . therefore, presents a . . . question of law . . . over which our review is de novo." (Citations omitted; internal quotation marks omitted.) *State* v. *Jackson,* supra, 304 Conn. 417.

The defendant, citing *United States* v. *Turner,* 761 A.2d 845 (D.C. 2000), claims that he was taken into custody when the search warrant was executed on him while he was being questioned. Any statements that he gave after the execution of the search warrant, the defendant argues, were involuntary because his *Miranda* rights had not been read to him at that time. The defendant claims that he would not have believed that he was free to leave the police station when he was required to give samples for DNA analysis.

Although the defendant claims that the search warrant was executed on him during the questioning by the detectives, the record is unclear. The search warrant was not submitted as an exhibit during the suppression hearing. During that hearing, Salkeld testified that he could not recall the exact time that he and Condon began speaking with the defendant on the morning of November 2, 2008. Salkeld also could not remember whether the search warrant was executed by Baez before or after the interview. He said that he thought that the defendant's interview lasted between fifteen minutes and one hour. During cross-examination, defense counsel showed Salkeld a copy of Baez' report. Salkeld acknowledged that the report indicated that the defendant still was being interviewed at 4:55 a.m. and that the execution of the search warrant appeared to have taken place at 5:05 a.m.[5]

Significantly, it never was determined if the interview was in progress at 4:55 a.m. or if it had nearly concluded at that time. Moreover, there is nothing in the record

that indicates which statements, if any, were made after the execution of the search warrant. Further, there is no testimony or other evidence regarding what was said or represented to the defendant at the time the search warrant was executed. With this record, we do not know, without speculation, the factual circumstances under which the buccal swab was taken or the clothing tested in order to determine whether the defendant then was in custody.

As previously discussed, it is the defendant's burden to prove custodial interrogation. *State* v. *Jackson*, supra, 304 Conn. 417. The defendant has failed to meet his burden in this case. Nothing in the record persuades us that the trial court's factual findings were clearly erroneous or that its application of the law to the facts was improper. We therefore conclude that the court properly denied the defendant's motion to suppress the oral statements that he gave to Salkeld and Condon on November 2, 2008.

II

A

The defendant's next claim is that Judge Gold, in his May 16, 2011 ruling, improperly determined that the defendant was competent to stand trial.[6] The defendant argues that Judge Gold, in concluding that he was competent, improperly relied on his refusal to participate in the competency interview as an indication that the defendant had assessed the situation and determined that it was to his advantage to decline to participate. The defendant claims that by relying on this factor, the court's "use of [the defendant's] invocation of his right to remain silent as evidence of competency violated due process."

At the May 16, 2011 competency hearing, Julie Jacobs, a forensic monitor at Connecticut Valley Hospital, testified that she was assigned to work on the defendant's case when he was admitted to the hospital in December, 2010. Jacobs testified that she was unable to prepare a formal competency evaluation of the defendant for the May 16, 2011 hearing because the defendant "chose not to engage" in the process. She testified that the defendant told her that he refused to participate in the evaluation because she had evaluated him in the past and found him to be competent. Because the defendant chose not to meet with Jacobs, she testified that the treatment team reached its competency conclusion on the basis of the defendant's treatment record, which included his medical record, progress notes, group notes, interviews with the defendant during his hospitalization and his previous evaluation. The team concluded that the defendant had the capacity to assist counsel if he chose to do so and that he had a rational and factual understanding of the charges against him, basic court procedures and personnel.

At the conclusion of the testimony at the May 16, 2011 hearing, defense counsel argued that the defendant had not been restored to competency. During his argument to the court, defense counsel expressed his belief that the hospital should have replaced Jacobs with another evaluator when the defendant refused to meet with her: "[I]t concerns me that they didn't make any attempt to get a different person to come and evaluate him in preparation of today's hearing knowing full well that he would refuse to meet with Ms. Jacobs, and it's not her fault. I mean, he has it in his head that she's prejudged him. He's not going to meet with her." The prosecutor, relying on the evidence presented at the hearing, stated: "[The defendant's] an intelligent individual. He knows it, and he knows how to manipulate the system, and that's exactly what he's doing."

Judge Gold found the defendant competent to stand trial. In reaching that determination, Judge Gold stated: "[The defendant's] decision not to participate in a formal evaluation process, as had been the hope of [the Whiting Forensic Division of Connecticut Valley Hospital], I think is volitional, and it is behavior that, in the court's opinion, evidences the fact that [the defendant] is an individual who makes decisions based on what he perceives to be the most productive course of action available to him. I believe that [the defendant] refused to participate in the interview because he felt that Whiting, having—or Ms. Jacobs or Mr.—or Dr. [Craig] Burns having already found [him] competent would find him competent again. So, he said, I'm not going to meet with them again.

"Well, that shows a fairly high and a fairly sophisticated level of assessment of the likelihood that a doctor will change his or her opinion, and I think he said no to those people because he knew the end result would be the same, or—well, let me take that back because that's unfair to the doctors who may have changed their opinion. But he thought that they wouldn't, and therefore it was a futile effort, so he refused to participate.

"Of course, he dangled in front of Ms. Jacobs and Dr. Burns the option of letting someone else interview him because he was not of the opinion that those other people would come to the same conclusion. So, he was willing to meet with the defense expert because he liked what the defense expert had to say, and he may have been willing to meet with someone else. But it's not the defendant who has the choice as to who his evaluators will be."

Our review of the court's ruling persuades us that Judge Gold based his decision, in part, on the defendant's *behavior*, i.e., his intentional and calculated decision to refuse to participate in the competency evaluation. Jacobs testified, and defense counsel

acknowledged in his argument to Judge Gold, that the defendant refused to speak to Jacobs because she previously opined that the defendant was competent and he believed her opinion would not change. As the court noted in its ruling, the defendant did not refuse to speak to everyone, he just refused to speak with anyone whom he believed would find him competent to stand trial.

There is no indication in the transcript of the hearing or elsewhere in the record that the defendant's refusal to participate in the evaluation was an invocation of his fifth amendment privilege against self-incrimination, as now claimed on appeal. The fifth amendment guarantees that no person in a criminal case shall be compelled to be a witness against himself. The privilege, however, "generally is not self-executing," meaning that an individual who desires its protection "must [affirmatively] claim it." (Internal quotation marks omitted.) *Salinas* v. *Texas*, U.S. , 133 S. Ct. 2174, 2178, 186 L. Ed. 2d 376 (2013). "[A] witness does not do so by simply standing mute." Id.

In the present case, Judge Gold found the defendant competent to stand trial because his refusal to cooperate in the competency evaluation evidenced a conscious decision on the defendant's part that was calculated to obtain the result that he believed was best for him. We conclude that the court did not base its determination of competency on improper considerations.

B

The defendant's next claim is that the court improperly denied defense counsel's requests for an additional competency evaluation of the defendant made during the course of the trial proceedings. The defendant argues that "[t]he trial court should have found reasonable doubts about [the defendant's] competency to stand trial and ordered an evaluation." He supports this argument with references to "[t]he vigor with which defense counsel asked for a competency evaluation," the defendant's "strange garbling of legal terminology," and the defendant's "fail[ure] to engage with any of the real issues in the case . . . ."

We first set forth the applicable standard of review and legal principles that guide our analysis. Section 54-56d (a) provides in relevant part that "[a] defendant shall not be tried, convicted or sentenced while the defendant is not competent. . . . [A] defendant is not competent if the defendant is unable to understand the proceedings against him or her or to assist in his or her own defense." "General Statutes § 54-56d (b), however, posits a presumption in favor of a defendant's competence. . . . Every criminal defendant is presumed to be competent. . . . During the course of the criminal proceedings, however, if it appears that the defendant is not competent, either party or the court may request an examination to determine the defendant's compe-

tency. General Statutes § 54-56d (c).

"The provisions of § 54-56d state that if it appears that the defendant is not competent, and if the trial court finds that a request for a competency evaluation is justified, the court must order a competency examination. We have interpreted this standard as requiring a competency evaluation any time a reasonable doubt is raised regarding the defendant's competency. . . . To establish such reasonable doubt, the defendant must present substantial evidence, not merely allegations, that he is incompetent. . . . Substantial evidence is a term of art. Evidence encompasses all information properly before the court, whether it is in the form of testimony or exhibits formally admitted or it is in the form of medical reports or other kinds of reports that have been filed with the court. Evidence is substantial if it raises a reasonable doubt about the defendant's competency. . . .

"We review the court's ruling on a motion for a competency evaluation under the abuse of discretion standard. . . . In determining whether the trial court [has] abused its discretion, this court must make every reasonable presumption in favor of [the correctness of] its action. . . . Our review of a trial court's exercise of the legal discretion vested in it is limited to the questions of whether the trial court correctly applied the law and could reasonably have reached the conclusion that it did." (Citation omitted; internal quotation marks omitted.) *State* v. *Crawley*, 138 Conn. App. 124, 139–40, 50 A.3d 349, cert. denied, 307 Conn. 925, 55 A.3d 565 (2012).

On February 10, 2012, which was the fifth day of trial, defense counsel twice orally moved for an additional competency evaluation of the defendant. The record reflects that the first oral request was made before the defendant exercised his right to testify on his own behalf, and the second oral request[7] was made before counsel's closing arguments.

With respect to the first request on the fifth day of trial, the state argued that the motion should be denied because the defendant had demonstrated his understanding of the trial proceedings through his conduct and statements to the court. The state further commented that the latest report from the professionals at the Whiting Forensic Division, which was dated December 20, 2011, indicated that the defendant was a malingerer. The state maintained that the defendant's behavior was calculated and could be controlled when he chose to do so. Defense counsel responded that he had "sincere and profound doubts about [the defendant's] competency to stand trial."[8] He claimed that the defendant's views "[did] not comport [with] reality" and that he refused to meet with his counsel.

The court, noting that the last competency evaluation concluded that the defendant was malingering and was

competent to stand trial, asked counsel if there was any difference in the defendant's behavior from the time of the last evaluation session to the time of voir dire and trial. The state responded: "Absolutely none. He keeps on saying the same things." Defense counsel responded: "Judge, to directly answer the court, there is no difference, but that does not allay the concerns that I have expressed . . . ."

Under the circumstances of this case, we cannot conclude that the court abused its discretion in denying defense counsel's requests for an additional competency evaluation. The most recent competency report, dated December 20, 2011, concluded that the defendant was competent to stand trial and that he had a sufficient understanding of the proceedings to assist his counsel at trial. The defendant was diagnosed as a malingerer. Judge Alexander, accepting the diagnosis of malingering as stated in the report, found the defendant competent to stand trial on January 6, 2012. Approximately one month later, defense counsel requested an additional competency evaluation of the defendant, even though he acknowledged that there had been no change in the defendant's behavior from the time of the last evaluation. The trial court, having had the opportunity to view the defendant's demeanor during voir dire and over the course of the trial proceedings, was in an advantageous position to evaluate the defendant's behavior as it affected his ability to assist in his defense. See *State* v. *Bigelow*, 120 Conn. App. 632, 642, 994 A.2d 204, cert. denied, 297 Conn. 916, 996 A.2d 278 (2010).[9] Accordingly, the court acted within its discretion in denying the two oral requests for an additional competency examination of the defendant.

### III

The defendant's next claim is that the court improperly forced him to choose between his right to representation by counsel and his right to testify on his own behalf. Additional facts and procedural history are necessary for the resolution of this claim.

When the defendant stated that he wanted to testify at trial, defense counsel[10] first argued that he was not a competent witness. The court immediately asked the defendant questions addressed to that issue and ruled that he was a competent witness. Defense counsel then argued that the defendant had not sought his attorneys' advice and did not want their counsel, and made the following representation: "[I]t's my assessment of the situation, Your Honor, that should [the defendant] take the [witness] stand and testify, he will *essentially* be representing himself." (Emphasis added.)

The court responded that the defendant had not waived his right to counsel and then asked defense counsel whether they were filing a motion to withdraw as counsel. Defense counsel indicated that they had

not filed such a motion, but that they would do so if necessary. The court directed several questions to the defendant: "[Y]our attorney is indicating that if you testify, you'll be representing yourself. Do you understand that?" When the defendant answered in the affirmative, the court asked: "Is that what you want to do?" The defendant responded: "I'll do so, ma'am." The court told the defendant that he had the right to an attorney, that he would be taking a risk by proceeding with his attorneys as standby counsel during his testimony, and that anything he said on the witness stand could affect the outcome of the case. The court warned the defendant that he would be at a disadvantage because he did not possess the training and skill of an attorney. The defendant responded: "I understand everything you're stating, ma'am." After reminding the defendant again that he had the right to be represented by counsel, and receiving his acknowledgement of that right, the court ruled: "I have to let him self-represent . . . during this point, counsel. But I'm going to appoint counsel as standby counsel, certainly for periods of—for purposes of objection during the cross-examination. . . . Well, standby counsel for purposes of his testimony only." Following the court's ruling, the state rested.

Defense counsel called four defense witnesses before the defendant took the witness stand to testify on his own behalf. After defense counsel asked the defendant some preliminary questions, the defendant gave a very short statement. The state's cross-examination was brief, and there was no redirect testimony.

On appeal, the defendant now argues that "the trial court violated the defendant's right to counsel by conditioning the defendant's right to testify in his own behalf on him waiving his right to counsel and proceeding pro se." The defendant claims that the court "forced [him] to choose between his right to counsel and his right to testify in his own behalf." According to the defendant, "the court allowed [the defendant's] attorneys to abandon him at a time that he needed them the most based solely on his desire to testify in his own behalf." The defendant admits that this claim is unpreserved, "in the sense that [the defendant] did not object and say that he wanted to have an attorney *and* testify on his own behalf," and therefore asks this court for review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[11] (Emphasis in original.)

It is not clear from the record that the defendant's counsel were no longer representing him at the time he chose to take the witness stand and testify on his own behalf.[12] What is clear is that the defendant was unequivocal in his demand to exercise his fundamental constitutional right to testify at trial.[13] What also is clear is that defense counsel persistently requested the court to find that the defendant either was incompetent to stand trial or was not competent to give testimony as

a witness. When they were unsuccessful in their numerous attempts to persuade the court of the defendant's incompetency, they then proceeded to distance themselves from the defendant's choice to exercise his right to testify before the jury on his own behalf.

The defendant was found by Judge Gold to have been restored to competency on May 16, 2011. The defendant was found competent to stand trial by Judge Alexander on January 6, 2012. Judge Dewey, during the jury trial, denied defense counsel's requests for an additional competency evaluation. The transcript is replete with the court asking the defendant questions to determine whether he understood his rights and the court proceedings. The court expressly stated that it agreed with the competency reports that diagnosed the defendant as a malingerer. It is apparent that defense counsel disagreed with these rulings, but their statements surrounding the defendant's choice to testify at trial were confusing and unhelpful to the court.

Defense counsel did not move, either orally or in writing, to withdraw as counsel for the defendant. Instead, defense counsel made the representation that counsel would file such a motion "if that's what I need to do." At no time did the court tell the defendant that if he chose to testify, he would have to waive his right to counsel. It was defense counsel who indicated that if the defendant chose to testify, he would essentially be self-represented and on his own. On appeal, the defendant represents that his trial attorneys "abandoned" him, yet he argues that it was the court that forced him to choose between two fundamental constitutional rights.[14]

Because of defense counsel's allusions to withdrawal and self-representation, the court did canvass the defendant as to the choices he was making. This canvass, along with the defendant's responses to the court's questions throughout the trial, led the court to conclude that the defendant could "self-represent . . . during this point" with his defense counsel as "standby counsel, certainly . . . for purposes of objection during the cross-examination" when the defendant testified on his own behalf. Even if we assume arguendo that the defendant was self-represented at that stage of the trial proceeding, we conclude that the court did canvass the defendant in accordance with Practice Book § 44-3 to ensure that his choice to proceed pro se had been made in a knowing and intelligent fashion. The court clearly advised the defendant that he had the right to counsel and made him aware of the dangers and disadvantages of self-representation. Additionally, the court had observed the defendant's conduct during the trial and remarked that his responses indicated an intelligence and capacity to appreciate the consequences of his choice. Further, the court reminded the defendant that, if convicted of murder, he faced a penalty of twenty-five

years to life imprisonment. See Practice Book § 44-3.

Accordingly, we conclude that the court did not force the defendant to choose between two constitutional rights.[15] Furthermore, the court canvassed the defendant several times during the trial in response to various claims made by defense counsel regarding the defendant's competency[16] and his choice to testify on his own behalf, "essentially . . . representing himself." The court's canvasses were thorough and appropriate. The defendant's claim fails.

IV

The defendant's next claim is that the court improperly dismissed a juror during the trial proceedings. He argues that "the juror in question was improperly replaced by an alternate through the court's erroneous understanding of the law." The defendant claims that "[t]he remedy for such an error should be a new trial." We are not persuaded.

By way of background, one of the defense witnesses testified that he had seen the defendant during the weekend of Reddick's death. His testimony, however, was confusing at times, and he gave contradictory answers on direct and cross-examination. One of the details the witness provided was that the day of the murder was warm and sunny. Shortly after the witness' testimony, one of the jurors gave a note to the clerk: "Can we find out what the weather was really like on November 1 into November 2 of 2008?" The remaining jurors were excused from the courtroom, and the court began questioning the juror about his note:

"The Court: Did you discuss this note with anyone?

"The Juror: No.

"The Court: This is your question, correct, and so the jurors haven't been discussing the evidence?

"The Juror: No.

"The Court: All right, so this is just something you're curious about?

"The Juror: Yes.

"The Court: Have you been forming an opinion about what the verdict should or shouldn't be?

"The Juror: No, I was just wondering about how the weather would correlate with another witness' testimony.

"The Court: Oh, I understand that, but my question is have you begun to think about [what] the verdict should or shouldn't be?

"The Juror: No, just wondering how things fit together."

The juror was excused to the jury room, and the court and counsel discussed the situation. Defense counsel

stated that he would "take [the juror] at his word" and not move to excuse him. The prosecutor responded: "I would ask to remove him, Your Honor, because when you asked him the question of whether he had made a decision with respect to the verdict, his first answer— he started to say yes, and then he kind of backed off a little bit and hemmed and hawed and he's like, no, I was just a little curious about trying to put it all together, and it sounds by his responses and his physical appearance when he was responding to the court's question that he already does have his mind made up with respect to things. He is thinking about the verdict, exactly what the court has told them not to do." Defense counsel disagreed with the prosecutor's assessment, and concluded by stating: "I'll leave it to the court, certainly . . . ."

The court called the juror back into the courtroom and told him: "I am really sorry, but it does indicate— you're beginning to do what I had asked [the jurors] not to do, begin to deliberate about what the verdict should or shouldn't be. I'm going to have to excuse you as a juror." An alternate juror replaced the excused juror, and the defendant then took the witness stand to testify on his own behalf. The defendant claims in his brief to this court that the dismissal was improper because the excused juror was "internally deliberating" only. (Emphasis omitted.) He argues that improper deliberation would require a discussion with the other jurors, and that the excused juror told the court that he had not discussed his note with the other jurors and that he had not made up his mind with respect to the verdict.

We first set forth the applicable standard of review. "A court may excuse a regular juror if that juror, for any reason, becomes unable to perform his or her duty. General Statutes § 54-82h (c). The power to excuse a juror under this section is expressly premised on a finding of cause. . . . Whether in the circumstances just cause exists to excuse a juror is a matter within the discretion of the . . . court." (Internal quotation marks omitted.) *State* v. *Banks*, 117 Conn. App. 102, 111–12, 978 A.2d 519, cert. denied, 294 Conn. 905, 982 A.2d 1081 (2009). "[P]resubmission discussion of the evidence by jurors in any degree is not an acceptable practice and constitutes misconduct." (Internal quotation marks omitted.) *Bova* v. *Commissioner of Correction*, 95 Conn. App. 129, 136, 894 A.2d 1067, cert. denied, 278 Conn. 920, 901 A.2d 43 (2006). Similarly, the preconceived or premature formation of an opinion with respect to the guilt of a defendant or the verdict may constitute juror misconduct. See *State* v. *Osimanti*, 299 Conn. 1, 34, 6 A.3d 790 (2010); *State* v. *Cubano*, 203 Conn. 81, 90–91, 523 A.2d 495 (1987).

The remarks of the court and counsel indicate that there was a legitimate concern that the juror already

had formed an opinion as to the guilt or innocence of the defendant. Although the juror responded that he had not yet decided what the verdict should be and that he had not discussed any of the evidence with the other jurors, we defer to the court's determination that there was cause to excuse the juror during the trial. "[W]e are aware of the broad discretion of a trial judge which includes his determination of the credibility to be given a juror's statement in this context." (Internal quotation marks omitted.) *State* v. *Osimanti*, supra, 299 Conn. 35. "[T]he trial judge has a superior opportunity to assess the proceedings over which he or she personally has presided . . . and thus is in a superior position to evaluate the credibility of allegations of jury misconduct, whatever their source." (Internal quotation marks omitted.) Id., 33–34.

Furthermore, the defendant has not shown how the juror's dismissal resulted in any harm to him. He has not claimed that this juror would have been beneficial to him if he had remained on the jury. See *State* v. *Mills*, 57 Conn. App. 356, 365, 748 A.2d 891 (2000). Instead, the defendant claims that "[t]his dismissal deprived [him] of his right to a trial by jury and his right to be tried by the jury that was actually empaneled (as opposed to the alternates) absent any legitimate reason for dismissal." The defendant provides no statute or case law in support of that claim.

To summarize, in reviewing a claim that the court abused its discretion in excusing a juror from the panel during the trial, we adhere to the rule that great weight is to be afforded to the action of the court and that every reasonable presumption should be given in favor of its correctness. The ultimate question is whether the trial court reasonably could conclude as it did. See *Rokus* v. *Bridgeport*, 191 Conn. 62, 72, 463 A.2d 252 (1983). From our careful review of the record, we cannot conclude that the trial court abused its discretion in excusing the juror.

V

The defendant's final claim is that the court's supplemental jury instructions, given in response to two jury notes requesting clarification of intent, were inadequate, and, in fact, allowed the jury to find him guilty on an uncharged and unproven theory of murder. The defendant argues that the jurors' questions "indicated that they had reasonable doubts" that he "had the intent to kill Reddick when the wounds were inflicted." He claims that the jury wanted to know whether it could find him guilty of murder for his intentional failure to obtain lifesaving medical treatment for Reddick, thereby forming the intent to kill *after* the wounds were inflicted. Because the information charged the defendant with the intent to kill at the time he inflicted the wounds, the defendant maintains that the court should have given the following supplemental instruction:

"[Y]ou may not convict if you find that intent to kill was only formed after the wounds were inflicted." As a result of the court's failure to give that instruction, the defendant claims, the jury found him guilty on an uncharged theory of murder, which constitutes reversible error.

The record reveals the following additional relevant facts and procedural history. The operative information alleged, in relevant part, that "on or about November 1, 2008, at 47 Berkeley Drive, Hartford, Connecticut, the said defendant with the intent to cause the death of Tashima Reddick, did cause the death of Tashima Reddick by inflicting multiple sharp force injuries to her body." The state tried its case pursuant to the charged theory of murder. After the parties rested and counsel gave their closing arguments, the court instructed the jury. The court first gave a general instruction on intent[17] and, subsequently, when charging on the crime of murder, the court gave further instructions on the element of specific intent.[18] The court provided a copy of its written instructions to the jury as a court exhibit.

At 4:40 p.m. that day, the jury gave the court its first note on the issue of intent. The note provided: "We know it is in the instructions but we would like clarification. Intent—The time frame to determine intent. Is it limited up to and during the infliction of the wounds, or [are] actions immediately after the infliction of those wounds also considered as far as intent." Because it was late in the afternoon, the court told counsel that it would prepare a supplemental instruction that evening and review it with them in the morning. The court then called the jurors into the courtroom and told them that it would provide a clarification on intent first thing in the morning.

The following morning, the court distributed to counsel its proposed supplemental instruction on intent. Defense counsel indicated that the jurors' question gave him concern that they were questioning whether the intent to kill could be formed after the injuries were inflicted "by not getting care, for instance." The prosecutor disagreed and stated that the court's supplemental instruction was a specific response to a specific question. The court agreed with the prosecutor and gave the supplemental instruction that it already had prepared.[19] A copy of the written supplemental instruction was provided to the jury as a court exhibit.

Shortly thereafter, the court received another note from the jury concerning the issue of intent. That note, in the form of a hypothetical question, read as follows: "A person inflicts potentially fatal injuries unto another person. The victim does not die and can be saved if immediate medical treatment is sought. The perpetrator does not seek medical help for the victim and *decides* to let the victim die. Does intent to commit murder happen in this situation when the perpetrator decides

to let the victim die even though it was after the physical altercation?" (Emphasis in original.) Defense counsel, again, expressed his concern that the jury was not confining itself to the crime as charged in the information, which alleged that the defendant formed the intent to kill Reddick at the time that he inflicted the injuries. Although defense counsel acknowledged that intent can be inferred from the defendant's conduct before, during and after the infliction of the injuries,[20] he argued that an intent to kill formed after the injuries were inflicted could not be the basis for a murder conviction because the state had not charged that theory of murder in the information.

The court called the jury into the courtroom and gave the following supplemental instruction on intent: "Intent is a question of fact for the jury, solely the question of fact, solely for you to determine. You can't speculate or expand the information; there must be evidence for the inference of intent. So, we can't direct you as to what to do. I'm suggesting that you look at the long form information and look at what the definition of intent is. Thank you." After the jury was excused to resume deliberations, the court stated: "I will note for the record, the jurors were nodding, they seemed to acquiesce in that instruction." Thereafter, the jury announced that it had reached a verdict and found the defendant guilty of murder.

The defendant does not claim that the supplemental instruction given by the court was erroneous in law. Rather, he claims that it was inadequate to address the jury's question because it expanded the charge of murder to encompass an uncharged theory of murder. The state argues that it was not reasonably possible that the court's instructions misled the jury and that the court's supplemental instruction on intent did not improperly expand the murder charge. We agree with the state.

We first set forth the applicable standard of review. "A claim that the court's jury instructions improperly enlarged the scope of the offense charged implicates the criminal defendant's sixth amendment rights, under the federal constitution, to be sufficiently informed of the nature of the charges against him. . . . The function of an accusatory pleading such as an information is to inform a defendant of the nature and cause of the accusation as required by our federal and state constitutions. . . . [That] the offense should be described with sufficient definiteness and particularity as to apprise the accused of the nature of the charge so he can prepare to meet it at his trial . . . are principles of constitutional law [that] are inveterate and sacrosanct. . . .

"[E]nlargement cases involve claims that the trial court expanded the state's information by instructing the jury on statutory or factual alternatives not charged

in the information. . . . The defendant's enlargement claims, like other claims that jury instructions violated a constitutional right, require us to exercise plenary review as we examine the charge as a whole to determine whether it misled the jury." (Citation omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Dunstan*, 145 Conn. App. 384, 395–96, 74 A.3d 559, cert. denied, 310 Conn. 958, 82 A.3d 626 (2013). "In other words, we must consider whether the instructions [in totality] are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury." (Internal quotation marks omitted.) *State* v. *Hampton*, 293 Conn. 435, 453, 978 A.2d 1089 (2009).

In the present case, the court's initial instructions on intent and specific intent were correct in law. It is well established that the fact finder may consider an accused's conduct after the commission of the crime as evidence of his intent at the time the crime was committed. See *State* v. *Otto*, 305 Conn. 51, 66–67, 43 A.3d 629 (2012). Further, the court's supplemental instructions on intent were correct in law. Although the defendant claims that the jury found him guilty on a theory of murder that was not charged in the information, the court expressly directed the jurors as follows: "You can't speculate or expand the information; there must be evidence for the inference of intent. . . . I'm suggesting that you look at the long form information and look at what the definition of intent is." The defendant's conduct after he inflicted the injuries clearly was relevant to the intent that he had when he inflicted those injuries. The court therefore properly refused to change its previous definition of specific intent and instructed the jurors to review the definition contained in their copy of the court's initial jury instructions.

"The jury is presumed, in the absence of a fair indication to the contrary, to have followed the court's instructions." (Internal quotation marks omitted.) *State* v. *Dunstan*, supra, 145 Conn. App. 396. There is nothing in the record that indicates that the jury did not follow the court's initial and supplemental instructions. Accordingly, we conclude that the court's supplemental instructions on intent did not improperly expand the charge of murder as set forth in the information.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] One of the cuts to Reddick's head, however, resulted in an injury that extended through her scalp and fractured the orbital ridge. If the wound had been one-half inch lower, the cutting instrument easily could have gone into her brain and been lethal.

[3] Subsequent testing revealed that the hair strands, bloodstains collected from the apartment and the blood on the front passenger seat of the 1998 Volvo matched the samples taken from Reddick's body. Reddick's DNA was found on the lip of the water bottle.

[4] General Statutes § 54-56d (c) provides: "Request for examination. If, at

any time during a criminal proceeding, it appears that the defendant is not competent, counsel for the defendant or for the state, or the court, on its own motion, may request an examination to determine the defendant's competency."

[5] Salkeld testified that the judge appeared to have signed the warrant at 6:09 a.m. that morning, calling into question the accuracy of the times on the warrant and Baez' report.

[6] We note that defense counsel requested another pretrial competency evaluation after Judge Gold's May 16, 2011 ruling, which was granted by Judge Alexander on September 28, 2011. A competency hearing was held on January 6, 2012, after the competency report was completed, and Judge Alexander accepted the diagnosis in the report that the defendant was malingering and found that he was competent to stand trial. The defendant has not challenged Judge Alexander's ruling in this appeal, even though it was made subsequent to Judge Gold's determination of competency.

[7] Defense counsel asked the court to reconsider its earlier ruling denying the oral request for a competency evaluation in light of the defendant's testimony before the jury. The court denied the second request: "I understand your position, counsel. Having heard the [defendant's] testimony, I am more inclined to concur with what happened at the competency evaluation [that concluded that the defendant was malingering]."

[8] "Although the opinion of defense counsel is a factor to be considered when considering a § 54-56d motion, the court need not accept counsel's opinion without question." (Internal quotation marks omitted.) *State* v. *Crawley*, supra, 138 Conn. App. 140–41.

[9] "[T]he trial judge is in a particularly advantageous position to observe a defendant's conduct during a trial and has a unique opportunity to assess a defendant's competency. A trial court's opinion, therefore, of the competency of a defendant is highly significant." (Internal quotation marks omitted.) *State* v. *Bigelow*, supra, 120 Conn. App. 642.

[10] The defendant was represented by two public defenders during the trial.

[11] Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original; footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40.

[12] Defense counsel stated: "[I]t's my assessment of the situation, Your Honor, that should [the defendant] take the [witness] stand and testify, he will *essentially* be representing himself." (Emphasis added.)

[13] "The right to testify on one's own behalf at a criminal trial has sources in several provisions of the Constitution. It is one of the rights that are essential to due process of law in a fair adversary process. . . . The necessary ingredients of the Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process of law include a right to be heard and to offer testimony . . . . The right to testify is also found in the Compulsory Process Clause of the Sixth Amendment, which grants a defendant the right to call witnesses in his favor . . . . Logically included . . . is a right to testify himself. . . . The opportunity to testify is also a necessary corollary to the Fifth Amendment's guarantee against compelled testimony. . . . A defendant's right to testify is also protected by his rights to a fair trial, to due process, to present a defense, and to be free from compelled testimony under article XVII of the amendments to the Connecticut constitution and under article first, § 8, of the Connecticut constitution." (Citations omitted; internal quotation marks omitted.) *State* v. *Shinn*, 47 Conn. App. 401, 410, 704 A.2d 816 (1997), cert. denied, 244 Conn. 913, 914, 713 A.2d 832, 833 (1998).

[14] This claim of the defendant has attributes similar to claims that our appellate courts have rejected under the doctrine of invited error. "As we previously have explained, the term induced error, or invited error, has been defined as [a]n error that a party cannot complain of on appeal because the party, through conduct, encouraged or prompted the trial court to make the erroneous ruling. . . . It is well established that a party who induces an error cannot be heard to later complain about that error. . . . This principle bars appellate review of induced nonconstitutional error *and* induced constitutional error." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Brunetti*, 279 Conn. 39, 59 n.32, 901

A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007).

[15] Even if we had concluded that the defendant had to choose between two constitutional rights, we note that "[t]he fact that an accused is confronted with the prospective waiver of one constitutional right in order to preserve the integrity of another constitutional right does not necessarily create a conflict that is in itself unconstitutional. . . . The fact that the defendant had to make a difficult choice between two constitutional rights does not deprive him of due process." (Citation omitted; internal quotation marks omitted.) *State* v. *Easton*, 111 Conn. App. 538, 543, 959 A.2d 1085 (2008), cert. denied, 290 Conn. 916, 965 A.2d 555 (2009).

[16] The defendant additionally claims that the court improperly failed to conduct an inquiry as to whether he was competent to represent himself when he elected to testify on his own behalf. Because this claim was not preserved at trial, he requests reversal under the plain error doctrine. Citing *State* v. *Connor*, 292 Conn. 483, 973 A.2d 627 (2009), the defendant argues that the court was required to make an additional determination that the defendant, although competent to stand trial, was competent to represent himself at that stage of the proceedings. As our Supreme Court held in *Connor*, "we conclude that, upon a finding that a mentally ill or mentally incapacitated defendant is competent to stand trial and to waive his right to counsel at that trial, the trial court must make another determination, that is, whether the defendant also is competent to conduct the trial proceedings without counsel." Id., 518–19.

The defendant's claim fails because, assuming arguendo that he is "mentally ill" or "mentally incapacitated," and assuming that he was self-represented for the limited purpose of testifying on his own behalf, there is nothing in the record to support the argument that the trial court failed to comply with the holding in *Connor*. As previously discussed, the court questioned the defendant several times during the course of the trial proceedings. Although the court did not explicitly find that the defendant was competent to represent himself under *Connor*, this case was tried before the jury after *Connor* was decided and the court is presumed to have applied the applicable law. See *State* v. *Kuncik*, 141 Conn. App. 288, 294–95, 61 A.3d 561 ("[t]he court was required to make a determination under the heightened standard set forth in *Connor* and, although the record does not reveal that the court ever expressly found that the defendant was competent to represent himself under such a standard, 'the court is presumed to know the law and apply it correctly to its legal determinations' "), cert. denied, 308 Conn. 936, 66 A.3d 498 (2013).

Accordingly, we conclude that the defendant cannot prevail under the plain error doctrine because he has not demonstrated that the failure to grant relief will result in manifest injustice. See *State* v. *Tierinni*, 144 Conn. App. 232, 238 n.2, 71 A.3d 675, cert. denied, 310 Conn. 911, 76 A.3d 627 (2013).

[17] The court's initial instruction on intent was as follows: "Intent is an element of each of the crime[s] charged. Intent relates to the condition of mind of the person who commits the act, his purpose in doing it. Specific intent is the intent to achieve a specific result. A person acts 'intentionally' with respect to a result when his conscious objective is to cause such result. What the defendant intended is a question of fact for you to determine.

"What a person's intention was is usually a matter to be determined by inference. No person is able to testify that he looked into another's mind and saw therein a certain knowledge or a certain purpose or intention to do harm to another. Because direct evidence of the defendant's state of mind is rarely available, intent is generally proved by circumstantial evidence. The only way a jury can ordinarily determine what a person's intention was at any given time is by determining what the person's conduct was and what the circumstances were surrounding that conduct and from that infer what his intention was.

"To draw such an inference is the proper function of a jury, provided of course that the inference drawn complies with the standards for inferences as explained in connection with my instruction on circumstantial evidence. The inference is not a necessary one. You are not required to infer a particular intent from the defendant's conduct or statements, but it is an inference that you may draw if you find it is reasonable and logical. I again remind you that the burden of proving intent beyond a reasonable doubt is on the state."

[18] In charging the jury on the crime of murder, the court gave the following instruction on the element of intent: "For you to find the defendant guilty of this charge, the state must prove the following elements beyond a reason-

able doubt:

"Element 1—Intent to cause death. The first element is that the defendant specifically intended to cause the death of another person. There is no particular length of time necessary for the defendant to have formed the specific intent to kill. A person acts 'intentionally' with respect to a result when his conscious objective is to cause such result.

"This is an offense that requires specific intent. The intent to cause death may be inferred from circumstantial evidence. Refer to the earlier instructions on specific intent and evidence of intent.

"The type and number of wounds inflicted, as well as the instrument used, may be considered as evidence of the perpetrator's intent, and from such evidence an inference may be drawn that there was intent to cause a death. The defendant's conduct subsequent to the infliction of injury may also be considered.

"Any inference that may be drawn from the nature of the instrumentality used and the manner of its use is an inference of fact to be drawn by you upon consideration of these and other circumstances in the case in accordance with my previous instructions. This inference is not a necessary one; that is, you are not required to infer intent from the defendant's alleged conduct, but it is an inference you may draw if you find it is reasonable and logical and in accordance with my instructions on circumstantial evidence."

[19] The court's supplemental instruction provided: "In response to your question last evening, as you indicated, intent is defined in the instructions. Both murder, as defined on pages 11–12, and intentional manslaughter in the first degree, pages 13–14, require specific intent. You have the general instruction on intent on page 3. Please note on page 11, I expanded that definition. It applies to both crimes.

"You are not limited to the time immediately preceding and during the injuries. If you find supporting evidence, intent can be inferred from action subsequent to the infliction of the wounds. In short, any evidence of intent, before, during and after, is relevant."

[20] "[T]he specific intent to kill is an essential element of the crime of murder. To act intentionally, the defendant must have had the conscious objective to cause the death of the victim. . . . Because direct evidence of the accused's state of mind is rarely available . . . intent is often inferred from conduct . . . and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom. . . . Intent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death." (Internal quotation marks omitted.) *State* v. *Otto*, 305 Conn. 51, 66–67, 43 A.3d 629 (2012).

––––––––––––––––––––––––