******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* HENRY T. COLLIN
(AC 35292)

Gruendel, Lavine and Dupont, Js.

*Argued October 9—officially released December 9, 2014*

(Appeal from Superior Court, judicial district of
Middlesex, Keller, J.)

*A. Paul Spinella*, with whom, was *Peter C. White*,
for the appellant (defendant).

*Sarah Hanna*, assistant state's attorney, with whom
were, *Russell C. Zentner*, senior assistant state's attorney, and, on the brief, *Peter A. McShane*, state's attorney, for the appellee (state).

*Opinion*

GRUENDEL, J. The defendant, Henry T. Collin, appeals from the judgment of conviction, rendered by the trial court, following a jury trial, of seven counts of sexual assault in the second degree in violation of General Statutes § 53a-71 (a) (1) and seven counts of risk of injury to a child in violation of General Statutes § 53-21 (a) (2). On appeal, the defendant claims that the trial court improperly: (1) refused to permit a defense witness, David Mantell, to testify as an expert on the topic of false confessions; (2) concluded that the defendant was not in custody before or during an interrogation of him at the state police barracks; (3) concluded that the defendant voluntarily consented to a police search of his boat and the seizure of its contents; (4) refused to instruct the jury that it should apply a "special scrutiny" when considering the defendant's confession because it was the product of an unrecorded police interrogation; and (5) excluded evidence of the victim's sexual history.[1] We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following relevant facts. The victim's stepfather knew the defendant, who owned and operated a mechanical repair business. The defendant repaired the engines of boats, jet skis, motorcycles, and other mechanical devices. When the victim, who was fourteen years of age and interested in mechanical work, told her stepfather that she was interested in obtaining a part-time job, her stepfather introduced her to the defendant, who was thirty-nine years of age. In December, 2009, the defendant hired the victim as an apprentice, but paid her "under the table." During the five or six months she worked for him, the defendant paid the victim approximately $250. The defendant often picked up the victim from school and took her to his home, where they worked in the backyard on various types of engines. They also went to other locations to work.

In March, 2010, the relationship between the victim and the defendant became more intimate, and they began dating. The victim had developed feelings for the defendant, and the defendant told the victim that he liked her and that, although they knew it was wrong, his life was in her hands. They began kissing in the defendant's pickup truck and on the defendant's boat, which, initially, was on dry dock, covered by a tarp, and sitting on stilts at the marina. The boat was a twenty-eight foot, 1979 Fiberform Executive yacht. The defendant took the victim out on his motorcycle, brought her to various restaurants and to the movie theater, and bought her gifts. The defendant also gave the victim an engagement ring, but instructed her not to tell anyone about it. He also told her not to tell anyone about their relationship because he could get in trouble.

As the relationship progressed, the victim and the defendant began engaging in vaginal and oral intercourse in the bedroom of the defendant's boat. There was evidence that, due to some medical problems, the defendant was unable to maintain a full erection or to ejaculate. To combat this problem, the defendant developed and used an "O" ring, which he placed around the base of his penis. He also used K-Y lubricant on his penis. The defendant told the victim that he loved her and would never hurt her. The defendant and the victim engaged in intercourse on the boat approximately ten times, both while the boat was on stilts and after it was put in the water. The last time the defendant and the victim had sexual relations was on Father's Day in 2010. Between April 1 and June 27, 2010, the defendant and the victim also made approximately 674 telephone calls to each other.

The victim previously had told some of her friends about her relationship with the defendant, and, on or about June 26, 2010, two of those friends accompanied her to a church parking lot where she told her stepfather about her relationship with the defendant. While the four of them were in the parking lot, the victim's stepfather telephoned the defendant, putting the call on speaker phone, and confronted him about the victim's accusations. The defendant denied having a sexual relationship with the victim.

On June 27, 2010, the victim and her mother met at their home with Detectives James McGlynn and Scott Wisner of the state police. The victim gave a statement to McGlynn in which she detailed her relationship with the defendant. The victim also drew a sketch of the area of the boat where she and the defendant had engaged in sexual relations and a sketch of the defendant's penis wearing the "O" ring device that he had developed to help him maintain an erection.

At the time the victim was meeting with McGlynn and Wisner, other members of the state police were stationed at the marina where the defendant docked his boat. When the defendant arrived at the marina with his fourteen year old niece, Sergeant Robert Derry instructed him that the police were there as part of an investigation. Derry asked the defendant for permission to search the boat and very clearly told him that he was not required to remain on the premises, and that he was free to leave. The defendant stated that he understood, but he stayed at the marina, nonetheless. The discussions between Derry and the defendant were calm, the defendant was not handcuffed or threatened, and he voiced no objections. The defendant signed a consent to search form that Derry provided to him.

When McGlynn finished interviewing the victim at her home, he proceeded to the marina where he introduced himself to the defendant. McGlynn told the defendant

that he would like to interview him regarding the victim's complaint and requested that the defendant follow him to the state police barracks. The defendant agreed, and he and his niece got into the defendant's truck and followed McGlynn to the state police barracks. Upon arriving at the barracks, the niece remained in the waiting room, while McGlynn and the defendant went to McGlynn's second floor office. McGlynn advised the defendant that he was not under arrest and that he was free to leave, and the defendant acknowledged that he understood. Wisner also was present in the office for a portion of the interview.

McGlynn asked the defendant about his relationship with the victim, and the defendant provided details of the relationship, including its sexual nature and that the last time he and the victim had engaged in intercourse was on Father's Day in 2010. The defendant stated that he loved the victim and that he had given her an engagement ring. As the interview progressed, the defendant told McGlynn that he was wearing the "O" ring while being interviewed. McGlynn reduced the defendant's verbal statement to writing and read him his *Miranda* warnings; see *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); which were preprinted on the statement. The defendant took an oath acknowledging that he had read the statement and that the statement was true. He then signed the statement in various places, including his acknowledgment that he had been read his *Miranda* warnings. The defendant asked to use the restroom, and, after using the facility, gave McGlynn the "O" ring that he had been wearing. McGlynn then placed the "O" ring in an envelope and tagged it as evidence. The defendant also signed a consent to search form related to the "O" ring.

As the interview concluded, McGlynn told the defendant that the victim's parents requested that the defendant not contact the victim. For the first time while being interviewed, the defendant broke down in tears, explaining to McGlynn that he was going to miss the victim and that he did not know how he was going to be without her. McGlynn and the defendant returned to the marina, where, at approximately 10:05 p.m., McGlynn seized two tubes of K-Y jelly.

Following the defendant's arrest on July 12, 2010, he was charged with seven counts of sexual assault in the second degree and seven counts of risk of injury to a child.[2] After a jury trial, the defendant was convicted on all counts, and sentenced to a total effective term of twenty years incarceration, execution suspended after eight years, with ten years of probation. This appeal followed.

I

The defendant claims that the court abused its discre-

tion by refusing to permit the defendant's expert, David Mantell, a licensed clinical psychologist, to testify on the topic of false confessions.[3] The defendant argues that Mantell was qualified as an expert on the topic of false confessions and that such testimony was necessary to assist the jury in its assessment of the defendant's testimony regarding his confession. The state argues, inter alia, that the defendant failed to prove that Mantell had sufficient expertise on the topic of false confessions, and, accordingly, that the court properly declined to permit him to testify as an expert on the topic of false confessions.[4] We agree with the state.

The following additional facts inform our review. On September 21, 2012, the parties discussed the issue of Mantell's testimony with the trial court, and defense counsel argued that, pursuant to § 7-4 of the Connecticut Code of Evidence,[5] Mantell was qualified to testify and to talk about what occurred during the defendant's confession. The defendant asserted that his confession was false and that Mantell's testimony would assist the jury in assessing the falsity of his confession. The prosecutor informed the court that he wanted an offer of proof regarding Mantell's expertise on the topic of false confessions and on the nature of the testimony he wanted to provide on false confessions.[6] The court set the matter down for a September 24, 2012 proffer hearing.

At the hearing, during defense counsel's offer of proof on, inter alia, Mantell's expertise on the topic of false confessions, the court reviewed Mantell's resume and asked defense counsel what on the resume demonstrated the development of expertise on the topic of false confessions. Counsel responded: "I can tell the court the basis of Dr. Mantell's expertise is the fact that he's testified previously." The court asked defense counsel how many times Mantell previously had testified as an expert on this issue, and counsel responded, "[o]ne time as a false confessions expert." He also stated that he was unaware of the specifics of that case, but that Mantell's testimony occurred in 2008 in Vermont. Counsel also stated that, although Mantell had not written on the subject himself, he was "familiar with the literature over the past ten to fifteen years and possibly longer because lying is a big issue in forensic interviewing. And false confession[s] are close to malingering type scenarios that are seen. And so he studied the literature on false confessions." Defense counsel was unaware of what literature Mantell had studied, however.

During Mantell's testimony at the proffer hearing, which took place out of the presence of the jury, he stated that he had testified on the topic of false confessions in approximately fourteen cases. When questioned further, however, he explained that most of those cases dealt with *false denials, rather than false confes-*

*sions*, or they were cases in which he *consulted with counsel* on the case, *but did not testify*. The court then asked Mantell what type of studies he had reviewed. Mantell explained that he had reviewed studies involving false confessions where the defendant, through DNA, later had been exonerated. He testified that "the researchers take a careful look at these cases and dissect the way in which [the accused had been] interrogated and also . . . look at the personality characteristics of the people who made these false confessions." He also stated that the commonality in the research findings was the tactics that were employed by the police during interrogations and the witness' reactions to those tactics. Mantell also stated that there was a second line of research with which he was familiar and that such research involved doing a personality evaluation of the defendants who later were exonerated. He explained that the common personality traits of these individuals included suggestibility, mental health problems, lower intelligence, and concentrated personal adversity that makes them less resilient to external pressure. The court asked Mantell whether he had evaluated the defendant in this case, and Mantell stated that he had not evaluated the defendant. Upon questioning by the prosecutor, Mantell also conceded that he was unfamiliar with any kind of psychological examination involving the defendant, that he had never seen the result of a psychological examination involving the defendant, and that he had no idea what such an examination might reveal. Additionally, Mantell admitted that he had no idea regarding the defendant's suggestibility, eagerness to please, level of intelligence, or propensity for mental illness. He also had no knowledge of the police interview process in this case, or whether there was DNA present in this case.

Mantell also explained that he had concerns when he reviewed the file in this case because there was no description of the interrogation process that was used, and he, therefore, was unaware of what tactics were used. He also stated that there was nothing in the defendant's confession that would help him "to understand the demeanor of the [defendant], what was motivating the [defendant] to provide such a detailed and explicit account of punishable, criminal offenses within such a relatively short period of time within that setting." He further explained that he "didn't understand the context in which [the confession] was achieved, and [he] didn't understand the motivation of the defendant to convey that kind of information, apparently, in a first interview with a police officer, presumably knowing or having some general knowledge of what the legal consequences would be for doing that." Mantell also stated that he had not reviewed or witnessed the in-court testimony of the police in this case regarding the questioning of the defendant.

Following the hearing, the court issued both an oral

ruling and a written memorandum of decision. The court found, inter alia, that the defendant had failed to prove that Mantell was qualified to give an expert opinion on the topic of false confessions, and that, "even if he were qualified, the testimony proposed [was] incomplete and not directly applicable or relevant . . . to assist the jury in understanding the evidence or in determining whether . . . . the defendant's testimony was false." The defendant claims that the court abused its discretion in refusing to allow Mantell to testify as an expert on the topic of false confessions.[7] We disagree.

"[T]he trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed. . . . In determining whether there has been an abuse of discretion, the ultimate issue is whether the court could reasonably conclude as it did. . . .

"[The Supreme Court] court recently articulated the test for the admission of expert testimony, which is deeply rooted in common law. Expert testimony should be admitted when: (1) the witness has a special skill or knowledge *directly applicable to a matter in issue*, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . . In other words, [i]n order to render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion. . . .

"It is well settled that [t]he true test of the admissibility of [expert] testimony is not whether the subject matter is common or uncommon, or whether many persons or few have some knowledge of the matter; but it is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the questions at issue. . . . Implicit in this standard is the requirement . . . that the expert's knowledge or experience . . . be directly applicable to the matter specifically in issue." (Emphasis added; internal quotation marks omitted.) *State* v. *Guilbert*, 306 Conn. 218, 229–30, 49 A.3d 705 (2012).

"In order to possess the requisite skill or knowledge to qualify as an expert, [i]t is not essential that an expert witness possess any particular credential . . . so long as his education or experience indicate that he has knowledge on a relevant subject significantly greater than that of such persons lacking such education or experience. . . . An expert witness' special skill or knowledge may emanate from a myriad of sources, such as teaching, scholarly writings, study or practical experience. . . . Regardless of the source of the expert's specialized knowledge, a court properly may

preclude testimony if the expert's knowledge does not pertain to the specific matter at issue." (Citations omitted; internal quotation marks omitted.) *State* v. *Ruocco*, 151 Conn. App. 732, 746, 95 A.3d 573, cert. denied, 314 Conn. 923,     A.3d     , cert. granted on other grounds, 314 Conn. 923,     A.3d     (2014).

The defendant argues on appeal that Mantell was qualified to testify on the topic of false confessions because he is "highly respected in the Connecticut courts," has knowledge of the "false confession phenomenon," and he previously has testified on the subject. The defendant also argues that it is not necessary that Mantell "specialize in the narrow field of false confessions . . . ." On the basis of the court's extensive findings, which are not challenged as clearly erroneous on appeal, and our careful review of the transcript of the proffer hearing, we are not persuaded.

Here, the court properly recognized that there must be a basis for qualifying a witness as an expert, and that a witness' qualifications are determined by the witness' knowledge, skill, and expertise in the particular area. The court specifically found, on the basis of the evidence presented during the proffer hearing, that, although Mantell had testified in one or two cases involving false confessions, his resume did not contain "one single indicator of expertise in false confessions." Additionally, although Mantell had read literature and other court cases on the subject, the court found that there was no evidence that he had an extensive educational background or training in false confessions, that he had performed any studies, surveys or research on the issue, that he had written any articles on the subject of false confessions, or that he had any expertise beyond forensic psychology as it pertains to family and children, especially neglected and abused children.[8] Furthermore, the court found, "[t]he fact that Mantell [was] an experienced forensic psychologist, predominately in an unrelated field, and [that he might have been] well read on the social psychology of false confessions, [did] not, in and of itself, demonstrate sufficiently to the court that he [was a] qualified expert on the subject of false confessions." We conclude that, on the basis of the evidence presented, the court correctly determined that the defendant had not established that Mantell was qualified to testify on the topic of false confessions because he failed to demonstrate that Mantell had sufficient expertise in the field.

Additionally, even if we were to agree that the court abused its discretion in concluding that the defendant had failed to prove that Mantell had expertise on the topic of false confessions, we, nonetheless, also would agree with the court's conclusion that the testimony proposed was "incomplete and not directly applicable" to this case, and that it would not have "assist[ed] the jury in understanding the evidence or in determining

whether . . . the defendant's confession was false." In short, we would conclude that the defendant failed to establish a nexus between Mantell's proposed testimony and the facts of this case.

Although Mantell discussed the general characteristics of someone who might be susceptible to giving a false confession during his testimony at the proffer hearing, he stated that he had not evaluated the defendant, that he was not familiar with any kind of psychological examination involving the defendant, that he had never seen the result of a psychological examination involving the defendant, and that he had no idea what such an examination might reveal. He also stated that he had no idea regarding the defendant's suggestibility, eagerness to please, level of intelligence, or propensity for mental illness. Additionally, although Mantell discussed the types of police interrogation tactics that might render a susceptible person more likely to give a false confession, he stated that he had no knowledge of the police interview and interrogation process in this case, and that he had not reviewed or heard the testimony given by the police regarding the interview and interrogation process in this case. He stated that there was nothing in the defendant's confession that would help him to understand the defendant's demeanor or motivation while being questioned by the police, and that he had no understanding of the context of the defendant's confession or why the defendant confessed despite knowing the legal consequences for doing so. On the basis of this evidence, we agree with the court's conclusion that the defendant failed to establish the necessary nexus for the proposed testimony. Accordingly, we conclude that the court did not abuse its discretion in precluding Mantell's testimony as an expert on the topic of false confessions.

II

The defendant next claims that the court improperly denied his motion to suppress his statements to the police, his confession, and the evidence that he claims was obtained as fruit of the poisonous tree. See *Wong Sun* v. *United States*, 371 U.S. 471, 485, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). The defendant argues that the level of police dominance and control over the marina for a prolonged three hour period of time demonstrates that the defendant was in custody, and that the court failed to review the totality of the situation when it denied the motion to suppress. We disagree.

The following additional facts are relevant to our review. The defendant filed a motion to suppress his statements to the police, his confession, and any evidence seized by the police on the ground that he was in custody and the police had not given him any *Miranda* warnings. See *Miranda* v. *Arizona*, supra, 384 U.S. 478–79. The court held a hearing on the motion, and, on September 10, 2012, issued a memorandum of decision

in which it denied the motion after finding that the defendant had not been in custody at the time he spoke to the police or when he gave his confession. Specifically, the court issued the following findings and conclusions of law. The defendant arrived at the marina at approximately 1:42 p.m., accompanied by his fourteen year old niece. At that time, state police Trooper Christopher Reid already was parked at the marina watching the defendant's boat, as he had been ordered to do. When the defendant and his niece boarded the boat, Reid approached them and told them that they could not be on the boat because it was a possible crime scene. Reid asked to see the defendant's license, and he asked the defendant if he would stand by until investigating detectives arrived on the scene. The defendant was cooperative, and Reid never raised his voice. At no time did Reid prevent any members of the public from entering or exiting the marina.

When Reid informed Derry that the defendant was at the marina, Derry told Reid that the defendant had a firearm permit, and, for safety reasons, Reid asked the defendant if he could pat him down and search his truck. The defendant agreed, and he also showed Reid his gun permit. Derry arrived at the marina at approximately 1:55 p.m., and he parked his police cruiser to the north of the defendant's truck, so that no vehicles were blocking the access to the marina exit. The defendant and his niece then were separated because of the sensitive nature of the discussion and the age of the niece. Derry told the defendant that he was free to leave and explained the nature of the police investigation. Derry contacted McGlynn and advised him that the defendant was at the marina. McGlynn told Derry to tell the defendant that he was not in custody and that he did not have to remain at the marina, and Derry complied. The defendant, however, choose to remain present, indicating to Derry that he had nothing to hide. Derry showed the defendant a consent to search form and asked if he would permit a search of the boat; he also told him, however, that he had a right to refuse at that time. The defendant agreed to the search and signed the form. Both Derry and the defendant were calm throughout their discussions, and the defendant was not handcuffed or restrained, no weapons were displayed, and no threats or promises were made to the defendant. The defendant was very cooperative.

The defendant and his niece sat on the truck or stood in the parking lot. The defendant never asked to leave and was told at least four times, by three different members of the state police, that he was free to leave. Both the defendant and his niece used their cell phones. By approximately 4:34 p.m., the search having concluded, the other members of the state police left the marina, leaving Reid as the only member of the state police present, and he was awaiting the arrival of McGlynn. The defendant and his niece also remained.

At approximately 5:15 p.m., McGlynn and Wisner, who were wearing plain clothes, arrived in an unmarked police vehicle. McGlynn immediately went to talk to the defendant, who was calm and cooperative. McGlynn asked the defendant if he was willing to follow them to the state police barracks so that they could talk, and the defendant agreed, leaving in his truck with his niece, following behind the police vehicles. The defendant parked in the front of the barracks, while the police drove to the back of the building to a parking lot reserved for police personnel. McGlynn and Wisner met the defendant in the lobby of the barracks, and they all went to McGlynn's office, with the exception of the defendant's niece, who remained in the lobby. Both McGlynn and Wisner told the defendant that he was not under arrest, and McGlynn also told him that he did not have to stay there for an interview and was free to leave. The defendant acknowledged that he understood.

McGlynn's office was twelve feet by fifteen feet, with a window, a comfortable couch, on which the defendant sat, two desks, and two chairs. The defendant conversed easily with the detectives for approximately one half to three quarters of an hour. He was not restrained or handcuffed; he was calm and cooperative. The interview was cordial and noncoercive. McGlynn then asked the defendant if he would sign a written statement. McGlynn advised the defendant of his *Miranda* warnings, typed the four page statement, read the statement out loud to the defendant, asked the defendant to read the statement to himself, and had the defendant sign next to the *Miranda* advisement on the statement. The defendant then signed each page of the statement under oath. His sworn signature then was witnessed on each page by McGlynn.

During his discussion with McGlynn, the defendant had told him about the "O" ring and had said that he was wearing the device. Subsequent to the statement being completed, the defendant asked to go to the restroom, and McGlynn escorted him down the hall to the facilities, where the defendant entered alone. As previously stated, when the defendant came out of the restroom, he gave McGlynn the "O" ring he had been wearing. McGlynn told the defendant that he had the right to refuse to allow McGlynn to seize the object, and he asked him to sign another consent to search form, giving McGlynn permission to seize the "O" ring that the defendant already had given to McGlynn. The defendant signed the form. The defendant also gave McGlynn permission to scroll through his cell phone, and he signed a consent to search form for that as well. Additionally, the defendant later accompanied McGlynn back to the marina where other items were seized on the basis of the earlier consent form that had been signed. The defendant did not object or attempt to limit his earlier consent, and he later left the marina without

being placed under arrest at that time. On the basis of these findings, the court concluded that the defendant was not in police custody when he was at the marina, when he was interrogated by McGlynn and Wisner at the barracks, when he gave his statement to McGlynn, when he handed McGlynn the "O" ring, or when he returned to the marina with McGlynn to seize other items from the boat.

The defendant claims that the court improperly denied his motion to suppress evidence after it wrongfully concluded that he had not been in police custody. He argues that the police dominated and controlled the marina, isolated him, singled him out as a suspect, and held him for a lengthy police interrogation—all of which evince a custodial interrogation. We are not persuaded.

"[O]ur standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [When] the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *State* v. *Early*, 152 Conn. App. 466, 475–76, 96 A.3d 651 (2014).

"Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation. . . . [A]lthough the circumstances of each case must certainly influence a determination of whether a suspect is in custody for purposes of receiving *Miranda* protection, the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. . . . Further, the United States Supreme Court has adopted an objective, reasonable person test for determining whether a defendant is in custody. . . . Thus, in determining whether *Miranda* [warnings] are required, the only relevant inquiry is whether a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest. . . .

"Furthermore, we note that [n]o definitive list of factors governs a determination of whether a reasonable person in the defendant's position would have believed that he or she was in custody. Because, however, the *Miranda* court expressed concern with protecting defendants against interrogations that take place in a police-dominated atmosphere containing inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely . . . circumstances relating to those kinds of concerns are

highly relevant on the custody issue. . . . In determining whether a reasonable person in the defendant's position would have believed that his freedom of movement was restrained to the degree associated with a formal arrest, our courts often have utilized the free to leave test, pursuant to which *Miranda* warnings are required only if, under the circumstances, a reasonable person would believe that he or she was not free to leave the scene of the interrogation. . . . The free to leave test is a good fit for a *Miranda* inquiry when the police interrogate someone at a police station . . . .

"The defendant bears the burden of proving custodial interrogation. . . . The trial court's determination of the historical circumstances surrounding the defendant's interrogation are findings of fact . . . which will not be overturned unless they are clearly erroneous. . . . In order to determine the [factual] issue of custody, however, we will conduct a scrupulous examination of the record . . . in order to ascertain whether, in light of the totality of circumstances, the trial court's finding is supported by substantial evidence. . . . The ultimate inquiry as to whether, in light of these factual circumstances, a reasonable person in the defendant's position would believe that he or she was in police custody of the degree associated with a formal arrest . . . calls for application of the controlling legal standard to the historical facts [and] . . . therefore, presents a . . . question of law . . . over which our review is de novo." (Citations omitted; internal quotation marks omitted.) *State* v. *Francis*, 148 Conn. App. 788, 799–801, 86 A.3d 1074, cert. granted on other grounds, 311 Conn. 940, 89 A.3d 349 (2014).

Here, as set forth previously in this opinion, the court made extensive factual findings related to this issue before concluding that the defendant was not in police custody at the marina, at the time he was interrogated, or at the time he gave his confession. The defendant does not challenge as clearly erroneous any of the court's factual findings, and our own careful examination of the record reveals that the court's conclusion that the defendant was not in custody is supported by substantial evidence. Accordingly, the court properly denied the defendant's motion to suppress on the basis that he was not in police custody.

### III

The defendant next claims that the court erred in denying his motion to suppress the evidence seized from his boat after improperly finding that he had voluntarily consented to a police search of the boat and the seizure of its contents. He argues that, because the police already had seized the boat by the time he got to the marina, he had no meaningful opportunity to object to the seizure of its contents. The defendant also asserts that this error was not harmless. We are not persuaded.

At the outset, we note that the defendant did not make this argument before the trial court. On appeal, however, the defendant claims that the seizure of items from the boat was unlawful because he could not meaningfully consent. Because the defendant raises this claim for the first time on appeal, he seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Under Golding, "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis omitted.) Id. This claim is appropriate for review as the record is adequate, and the claim is of constitutional dimension. The claim fails, however, under *Golding*'s third prong.

"A warrantless search is not unreasonable under either the fourth amendment to the constitution of the United States or article first, § 7, of the constitution of Connecticut if a person with authority to do so has freely consented to the search. . . . The state bears the burden of proving that the consent was free and voluntary. . . . The state must affirmatively establish that the consent was voluntary; mere acquiescence to a claim of lawful authority is not enough to meet the state's burden. . . . The question whether consent to a search has in fact been freely and voluntarily given, or was the product of coercion, express or implied . . . is a question of fact to be determined from the totality of all the circumstances. . . . As a question of fact, it is normally to be decided by the trial court upon the evidence before that court together with the reasonable inferences to be drawn from that evidence. . . . We may reverse [the trial court's factual] findings on appeal only if they are clearly erroneous. . . . Thus, [w]hether there was valid consent to a search is a factual question that will not be lightly overturned on appeal. . . .

"In determining whether a defendant's will was overborne in a particular case, the [c]ourt has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation. Some of the factors taken into account have included the youth of the accused . . . his lack of education . . . or his low intelligence . . . the lack of any advice to the accused of his constitutional rights . . . the length of detention . . . the repeated and prolonged nature of the questioning . . . and the use of physical punishment such as the deprivation of food or sleep . . . . In analyzing these factors, the Supreme Court noted that it had determined the factual circum-

stances surrounding the confession, assessed the psychological impact on the accused, and evaluated the legal significance of how the accused reacted. . . .

"In evaluating the voluntariness of the defendant's consent, we note that, while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent. . . . The Supreme Court has emphasized that this rule remains applicable to requests for consent to search during traffic stops, calling it unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Jenkins*, 298 Conn. 209, 249–51, 3 A.3d 806 (2010).

The defendant claims that his consent to search the boat was involuntary because the police already had seized the boat by the time he got to the marina. Therefore, he argues, he had no meaningful opportunity to object to the seizure of the boat's contents.[9] On the basis of the numerous findings of the trial court, which are not challenged as clearly erroneous on appeal, we conclude that this claim is meritless.

The court found that the defendant arrived at the marina at approximately 1:42 p.m., accompanied by his niece. Reid already was at the marina, and when the defendant and his niece boarded the boat, Reid told them that they could not remain on the boat because it was a possible crime scene. Reid then asked the defendant if he would stay on the scene until investigating detectives arrived. The defendant was cooperative, and Reid did not raise his voice. When Derry arrived at the marina just a few minutes later, Derry spoke with the defendant privately about the nature of the police investigation, and he told the defendant that he was free to leave. Derry then contacted McGlynn, who told Derry to tell the defendant that he was not in custody and that he did not have to remain at the marina, and Derry complied. The defendant chose to remain present, indicating to Derry that he had nothing to hide. Derry then showed the defendant a consent to search form and asked if he would allow a search of the boat. Derry also told the defendant that he had a right to refuse. The defendant, however, agreed to permit the search, and he signed the form. Both Derry and the defendant remained calm throughout their discussions. The defendant was not handcuffed or restrained, he was not threatened, no promises were made to him, and no weapons were displayed.

On the basis of the trial court's extensive findings, and the court's consideration of the totality of the circumstances, we conclude that the court's determination that the defendant's consent was voluntary was not clearly erroneous. Accordingly, no clear constitutional

violation exists, and the defendant's claim fails under *Golding*'s third prong. The court properly denied the defendant's motion to suppress the items seized from the boat.

IV

The defendant next claims that the court abused its discretion in refusing to instruct the jury to apply "special scrutiny" when assessing the defendant's confession, which had been admitted into evidence, because the confession was the product of an unrecorded police interrogation.[10] He argues that the court's refusal to give this charge implicates his right to present a complete defense. We disagree.

"We begin with the well established standard of review governing the defendant's [challenge] to the trial court's jury instruction. Our review of the defendant's claim requires that we examine the [trial] court's entire charge to determine whether it is reasonably possible that the jury could have been misled by the omission of the requested instruction. . . . [Although] a request to charge that is relevant to the issues in a case and that accurately states the applicable law must be honored, a [trial] court need not tailor its charge to the precise letter of such a request. . . . If a requested charge is in substance given, the [trial] court's failure to give a charge in exact conformance with the words of the request will not constitute a ground for reversal. . . . As long as [the instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper. . . . Additionally, we have noted that [a]n [impropriety] in instructions in a criminal case is reversible . . . when it is shown that it is reasonably possible for [improprieties] of constitutional dimension or reasonably probable for nonconstitutional [improprieties] that the jury [was] misled. . . .

"In determining whether the trial court improperly refused a request to charge, [w]e . . . review the evidence presented at trial in the light most favorable to supporting the . . . proposed charge. . . . A request to charge [that] is relevant to the issues of [a] case and which is an accurate statement of the law must be given. . . . If, however, the evidence would not reasonably support a finding of the particular issue, the trial court has a duty not to submit it to the jury. . . . Thus, a trial court should instruct the jury in accordance with a party's request to charge [only] if the proposed instructions are reasonably supported by the evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Baltas*, 311 Conn. 786, 808–810, 91 A.3d 384 (2014).

On September 28, 2012, the trial court held an on the record charging conference. During the discussion, the court informed counsel that it was not going to give the jury an instruction that had been requested by the

defendant that stated the jury did not have a complete picture of what occurred during the defendant's interrogation because of the lack of a recorded interrogation in this case. See footnote 10 of this opinion. The defendant challenges that ruling on appeal. Although he claims that the ruling implicated his right to present a defense, he sets forth no analysis or standard of review applicable to such a right. He merely argues that the court abused its discretion in denying his request. Accordingly, we deem any constitutional claim abandoned.

As our Supreme Court explained in *State* v. *Corbin*, 260 Conn. 730, 742, 799 A.2d 1056 (2002): "While the preliminary question of admissibility of a confession is for the court, the credibility and weight to be accorded the confession is for the jury. . . . [T]his rule does not require the court to give a particular instruction to the jury regarding the credibility of [the defendant's] confession simply because [the] confession was a significant piece of evidence. A court has discretion in determining what instructions a jury is to receive. . . . The degree to which reference to the evidence may be [made] . . . lies largely in the discretion of the court." (Citations omitted; internal quotation marks omitted.)

In its instruction to the jury, the court explained to the jury: "You are the sole judge of the facts. It is your duty to find the facts. You are to recollect and weigh the evidence and form your own conclusions as to what the ultimate facts are." The court further explained: "In deciding what the facts are, you must consider all the evidence. In doing this, you must decide which testimony to believe and which testimony not to believe. You may believe or disbelieve all, none or any part of any witness' testimony. In making that decision, you may take into account a number of factors, including the following: Was the witness able to see or hear or know the things about which the witness testified, how well was the witness able to recall and describe those things during the course of his or her testimony, what was the witness' manner or demeanor while testifying, did the witness have any interest in the outcome of this case or any bias or prejudice concerning any party or any matter involved in the case, how reasonable was the witness' testimony considered in light of all the evidence in the case, [and] was the witness' testimony contradicted by what that witness has said or done at another time or by the testimony of other witnesses or by other evidence.

"If you conclude that a witness has deliberately testified falsely in some respect, you should carefully consider whether you should rely on any of that person's testimony. In deciding whether or not to believe a witness, keep in mind that people sometimes forget things, particularly, with the passage of time. You need to consider, therefore, whether a contradiction or inconsistency is an innocent lapse of memory or an intentional

falsehood and that may depend on whether it has to do with an important fact or with only a small detail. A prior contradiction or inconsistency may be considered by you in assessing a witness' credibility. These are some of the factors you may consider in deciding whether to believe testimony.

"You size up each witness and then make your own judgment as to his or her credibility and decide what portion, all, some or none, of any particular witness' testimony you will believe. You should use all of your experiences, your knowledge of human nature and the motive[s] which influence and control human conduct, and you should test the evidence against that knowledge. In short, you are to use the same sound judgment with which you test truth and veracity as it daily occurs in the ordinary course of your own lives."

Specifically as to the defendant's statements to the police, the court instructed that the statements "are to be considered by you together with all the evidence, and you should give them such weight as they appear to be entitled to in view of all the circumstances under which they were made." The court then explained to the jury that it "must determine the credibility of a police official in the same way and by the same standards as [it] would evaluate the testimony of a witness who is not a police official. The testimony of a police official is entitled to no special or exclusive weight merely because it comes from a police official."

The court instructed: "You should neither believe nor disbelieve the testimony of a police official just because the witness is a police official. You have heard evidence in this case of various statements made by witnesses and the defendant on different dates [that] were not recorded either by videotape or audiotape. Our law in this state does not require that such statement be electronically recorded." The court also thoroughly instructed the jury on reasonable doubt and the presumption of innocence.

Our careful review of the court's detailed instructions, viewed as a whole, reveals that they were correct in law and were sufficient to guide the jury in its task of evaluating all of the evidence, including the defendant's statements and his confession, and the circumstances related thereto. Accordingly, we conclude that the trial court's instructions fairly represented the case to the jury, so that no injustice was done.

V

The defendant's final claim is that the court abused its discretion and improperly restricted his right to confrontation by excluding evidence of the victim's alleged sexual history. The defendant claims that this evidence would have "provided [his] expert with the foundation for an opinion as to how the [victim] would fabricate a claim of sexual abuse" and that "it bore directly on

the issue of an alternate source for [the victim's] sexual knowledge." The state contends that this claim is meritless. We agree with the state.

The following additional facts are relevant to our consideration of this claim. At a September 17, 2012 hearing, the court, inter alia, considered the admissibility of the fourteen year old victim's sexual history. The defendant asserted that, pursuant to subsection (4) of General Statutes § 54-86f, which commonly is referred to as the rape shield statute, and *State* v. *Rolon*, 257 Conn. 156, 777 A.2d 604 (2001), the sexual history of the victim should be admitted because it demonstrated that the victim was prematurely sexualized, which caused her to pursue the defendant and to fabricate a relationship with him, and it showed an alternate basis for the victim's sexual knowledge. He also argued that this evidence would not prejudice the victim because her name had been redacted from the record. The state vigorously objected to this evidence, arguing that there was no indication that the victim was confused about what had happened with the defendant, that she was fourteen years old when the defendant had a sexual relationship with her, and that she was not a toddler for whom an alternate basis of sexual knowledge might be relevant. The court determined that the evidence did not meet the test established in *Rolon*, that it was not relevant or necessary to the defendant's theory that the victim had fabricated the assaults, and that, because the victim was not a young child, an alternate source of sexual knowledge was not a critical issue in the case. Accordingly, the court determined that such evidence was inadmissible. The court later ruled, however, that the defendant could ask the victim how she knew about fellatio, cunnilingus, and vaginal intercourse prior to the defendant's sexual assaults, and the defendant did make such an inquiry during his cross-examination of the victim. The defendant now claims that the court abused its discretion and improperly restricted his right to confrontation by barring evidence of the victim's sexual history.

It is well established under our law that a defendant has the right to confront witnesses against him as guaranteed by the confrontation clauses of both our federal and state constitutions. U.S. Const., amends. VI and XIV; Conn. Const., art. I, § 8. "[T]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process. . . .

"We are mindful, however, that the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. . . . For example, the trial court has a right, indeed, [a] duty, to

exclude irrelevant evidence. . . . The rules excluding evidence from criminal trials, however, may not be arbitrary or disproportionate to the purposes they are designed to serve." (Citations omitted; internal quotation marks omitted.) *State* v. *Rolon*, supra, 257 Conn. 175–76.

The rape shield statute, § 54-86f, "was enacted specifically to bar or limit the use of prior sexual conduct of an alleged victim of a sexual assault because it is such highly prejudicial material. . . . Our legislature has determined that, except in specific instances, and taking the defendant's constitutional rights into account, evidence of prior sexual conduct is to be excluded for policy purposes. Some of these policies include protecting the victim's sexual privacy and shielding her from undue harassment, encouraging reports of sexual assault, and enabling the victim to testify in court with less fear of embarrassment. . . . Other policies promoted by the law include avoiding prejudice to the victim, jury confusion and waste of time on collateral matters. . . .

"However, [a]lthough the state's interests in limiting the admissibility of this type of evidence are substantial, they cannot by themselves outweigh the defendant's competing constitutional interests. . . . We must remember that [t]he determination of whether the state's interests in excluding evidence must yield to those interests of the defendant is determined by the facts and circumstances of the particular case. . . . In every criminal case, the defendant has an important interest in being permitted to introduce evidence relevant to his defense. Evidence is not rendered inadmissible because it is not conclusive. All that is required is that the evidence tend to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative. . . . Whenever the rape shield statute's preclusion of prior sexual conduct is invoked, a question of relevancy arises. If the evidence is probative, the statute's protection yields to constitutional rights that assure a full and fair defense. . . . If the defendant's offer of proof is sufficient to show relevancy, and that the evidence is more probative to the defense than prejudicial to the victim, it must be deemed admissible at trial. . . . When the trial court excludes defense evidence that provides the defendant with a basis for cross-examination of the state's witnesses, [despite what might be considered a sufficient offer of proof] such exclusion may give rise to a claim of denial of the right to confrontation and to present a defense." (Citations omitted; internal quotation marks omitted.) *State* v. *Cecil J.*, 291 Conn. 813, 823–24, 970 A.2d 710 (2009).

Section 54-86f provides in relevant part: "In any prosecution for sexual assault under sections 53a-70, 53a-70a, and 53a-71 to 53a-73a, inclusive, no evidence of

the sexual conduct of the victim may be admissible unless such evidence is (1) offered by the defendant on the issue of whether the defendant was, with respect to the victim, the source of semen, disease, pregnancy or injury, or (2) offered by the defendant on the issue of credibility of the victim, provided the victim has testified on direct examination as to his or her sexual conduct, or (3) any evidence of sexual conduct with the defendant offered by the defendant on the issue of consent by the victim, when consent is raised as a defense by the defendant, or (4) otherwise so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights. Such evidence shall be admissible only after a hearing on a motion to offer such evidence containing an offer of proof. On motion of either party the court may order such hearing held in camera, subject to the provisions of section 51-164x. If the proceeding is a trial with a jury, such hearing shall be held in the absence of the jury. If, after hearing, the court finds that the evidence meets the requirements of this section and that the probative value of the evidence outweighs its prejudicial effect on the victim, the court may grant the motion. . . ."

In *State* v. *Rolon*, supra, 257 Conn. 185–86, our Supreme Court "recognized the critical nature of prior sexual abuse evidence in the defendant's effort to rebut the inference that [the defendant] is the source of [the victim's] sexual knowledge or behavioral characteristics. [I]f the jury is not allowed to learn of the [prior sexual] offenses against [the victim], then [it] will inevitably conclude that the [victim's] highly age-inappropriate sexual knowledge could only come from [the] defendant having committed such acts. . . . Without that evidence, [t]he inference that [a victim] could not possess the sexual knowledge he [or she] does unless [the defendant] sexually assaulted [him or her] greatly bolsters [a victim's] allegations. . . . In order to rebut that inference, [the defendant] must establish an alternative source for [the victim's] sexual knowledge . . . [as] a necessary and critical element of [his] defense. . . . Simply put, the prior sexual conduct must account for how the [victim] could provide the testimony's sexual detail without having suffered [the] defendant's alleged conduct. . . .

"A clear statement of the defendant's theory of relevance is all important in determining whether the evidence is offered for a permissible purpose. . . . In [*Rolon*, our Supreme Court] concluded that in order for evidence of a victim's prior sexual conduct to be admissible under § 54-86f to show a source for the victim's sexual knowledge, [p]rior to trial the defendant must make an offer of proof showing: (1) that the prior acts clearly occurred; (2) that the acts closely resembled those of the present case; (3) that the prior [acts are] clearly relevant to a material issue; (4) that the

evidence is necessary to [the] defendant's case; and (5) that the probative value of the evidence outweighs its prejudicial effect." (Citations omitted; internal quotation marks omitted.) *State* v. *Cecil J.*, supra, 291 Conn. 824–25.

In the present case, the defendant sought to introduce evidence of the victim's sexual history to prove that she was fabricating the extent of her relationship with the defendant and to explain the basis of her sexual knowledge. The court found that the victim's sexual history would do neither, and that the defendant had failed to establish four of the five prongs of the *Rolon* test. See *State* v. *Rolon*, supra, 257 Conn. 183–84.

On appeal, the defendant sets forth the *Rolon* criteria, but fails to articulate how evidence of the victim's sexual history specifically meets each prong of the *Rolon* test. Our own review of the record, including the defendant's proffer to the trial court and his arguments on appeal, leads us to the firm conclusion that the court properly held that the defendant failed to satisfy the *Rolon* test and failed to prove the relevancy of the proffered evidence. Although the defendant arguably satisfied the first prong of the *Rolon* test, namely, that the prior acts clearly occurred, he failed to satisfy any of the remaining prongs. The victim's prior sexual history did not closely resemble those of the present case; the history was not clearly relevant to a material issue in this case; the history was not necessary to the case because the defendant was permitted to, and did elicit, information from the victim that she had prior sexual knowledge before the defendant's sexual abuse; and the history certainly was much more prejudicial than probative. See id.; see also id., 180–181 (distinguishing in part *State* v. *Kulmac*, 230 Conn. 43, 644 A.2d 887 [1994], on the ground that "the victims in *Kulmac* were ages fourteen and fifteen at the time of trial . . . an age at which most young adults are less likely to be confused over an individual's identity and are capable of understanding matters of a sexual nature" [citation omitted]). Additionally, there is no case law or persuasive argument presented by the defendant to support a proposition that evidence of the victim's sexual history would have supported the defendant's claim that she fabricated her relationship with him—there being no allegation that her prior sexual history included fabrication of any type. Accordingly, the court properly prohibited an inquiry into the victim's sexual history.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[2] The defendant also was charged under a separate docket number with one count of sexual assault in the second degree and one count of risk of injury to a child on the basis of allegations made by the victim involving

conduct of the defendant that allegedly occurred in a different municipality. The cases were joined for trial. The jury found the defendant not guilty of the crimes that were alleged to have occurred in the other municipality.

[3] During oral argument before us, the panel asked the defendant's appellate attorney if he was "claiming that this defendant was somehow . . . specially subject to coercion or manipulation due to any mental, psychiatric, [or] psychological predisposition or problem," to which counsel replied that he was not making such a claim.

[4] We note that the defendant's failure to submit sufficient proof in this case of Mantell's expertise in the area of false confessions, either through testimony or through other evidence, does not necessitate a conclusion that such expertise could not be established in another case. We also note that Mantell was permitted to testify as an expert on other issues in this case.

[5] Section 7-4 of the Connecticut Code of Evidence provides: "(a) Opinion testimony by experts. An expert may testify in the form of an opinion and give reasons therefor, provided sufficient facts are shown as the foundation for the expert's opinion.

"(b) Bases of opinion testimony by experts. The facts in the particular case upon which an expert bases an opinion may be those perceived by or made known to the expert at or before the proceeding. The facts need not be admissible in evidence if of a type customarily relied on by experts in the particular field in forming opinions on the subject. The facts relied on pursuant to this subsection are not substantive evidence, unless otherwise admissible as such evidence.

"(c) Hypothetical questions. An expert may give an opinion in response to a hypothetical question provided that the hypothetical question (1) presents the facts in such a manner that they bear a true and fair relationship to each other and to the evidence in the case, (2) is not worded so as to mislead or confuse the jury, and (3) is not so lacking in the essential facts as to be without value in the decision of the case. A hypothetical question need not contain all of the facts in evidence."

[6] We note that the suitability of a *Porter* hearing in this instance is not before us. See *State* v. *Porter*, 241 Conn. 57, 80–90, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998). Although the court inquired as to whether a *Porter* hearing was necessary, the state did not request such a hearing, and defense counsel stated that he "would argue that false confession testimony is so well accepted in Connecticut and in the country that a *Porter* hearing isn't necessary at all." He also stated that *Porter* did not apply to testimony about false confessions because "it's not scientific."

[7] The defendant also claims that the court improperly stated that jurors could use their common sense to ascertain whether someone falsely confessed. We have reviewed the court's memorandum of decision and take this opportunity to disavow the following statement: "The proposed testimony would be nothing more than a barrage of possibly impressive jargon which is nothing more than a set of academic synonyms for threats, promises, and other inducements made to a confessor. The average juror possesses the common knowledge, when provided with evidence of fear, anxiety, threats, promises, inducements, and other circumstances surrounding the confession, to consider the defendant's claim that certain circumstances on June 27 [2010] led him to falsely confess."

[8] Mantell was permitted to testify on this topic during the defendant's trial.

[9] We note that the defendant did not claim before the trial court or on appeal that the seizure of the boat was unlawful.

[10] The defendant's requested instruction provided: "Where there is a failure to electronically record an interrogation, you have not been provided with a complete picture of all of the facts surrounding the defendant's statement and the precise details of that statement. By way of example, you cannot hear the tone or inflection of the defendant's or interrogator's voices, or hear first hand the interrogation, both questions and answers, in their entirety. Instead, you have been presented with a summary based upon the recollections of law enforcement personnel.

"Furthermore, in considering whether or not an oral statement was actually made by the defendant, and if made, whether it is credible, you should receive, weigh, and consider this evidence with caution as well, based on the generally recognized risk of misunderstanding by the hearer, or the ability of the hearer to recall accurately the words used by the defendant. The specific words used and ability to remember them are important to the correct understanding of any oral communication because the presence, or absence, of a single word may substantially change the true meaning of

even the shortest sentence."

———————————————————